1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   WENDELL HARRISON,                          CASE NO. CV-F-03-5005 AWI SMS HC

12                  Petitioner,                 FINDINGS AND RECOMMENDATIONS_
                                                REGARDING PETITION FOR WRIT OF
13        vs.                                   HABEAS CORPUS

14   YARBOROUGH,                                [Doc. 1]

15                  Respondent.
     _____/
16

17        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant

18   to 28 U.S.C. § 2254.

19                         <u>PROCEDURAL HISTORY</u>[1]

20        Petitioner was convicted in the Kern County Superior Court for detonation of a bomb causing

21   bodily injury in violation of California Penal Code section 12309, and detonation of a bomb causing

22   mayhem or great bodily injury in violation of California Penal Code section 12310(b).  On October

23   29, 1996, Petitioner was sentenced to state prison for a term of life plus nine years.

24        Petitioner filed a timely notice of appeal with the California Court of Appeal, Fifth Appellate

25   District. On May 19, 1998, the Court of Appeal affirmed the judgment.

26        Petitioner filed a petition for review with the California Supreme Court.  The petition was

27

28        _____
          [1] This information is derived from Petitioner's petition for writ of habeas corpus and Respondent's answer.

denied on July 29, 1998.

Petitioner's petitions for writ of habeas corpus were denied: (1) on the merits by the Kern County Superior Court on June 21, 1999; (2) without prejudice and on procedural grounds by the Fifth District Court of Appeal on July 9, 1999; and (3) on procedural grounds by the California Supreme Court in October 1999. Another petition for writ of habeas corpus was denied on the merits by the California Supreme Court on December 18, 2002.

Petitioner filed the instant federal petition on January 3, 2003. By order of March 20, 2003, the court directed Respondent to file a response. Respondent filed an answer on June 19, 2003. Petitioner filed a traverse on July 22, 2003.

On November 16, 2004, the Court directed Respondent to submit supplemental briefing regarding Petitioner's claim that his due process rights were violated by the use of the electronic stun belt. Respondent submitted briefing on December 17, 2004, and Petitioner filed a reply on January 6, 2005.

Pursuant to this Court's May 13, 2005 order, Respondent submitted supplemental briefing regarding Petitioner's juror misconduct claim on July 19, 2005.

## STATEMENT OF FACTS[2]

On the evening of October 18, 1995, there was a disturbance in the alley behind an apartment complex in Ridgecrest. Five to 15 minutes later, [Petitioner] approached the rear of the complex through a vacant lot. Shouting "Take this bitch" to a woman standing beside the car in the complex parking lot, [Petitioner] threw a bottle that landed on an awning that covered part of the parking lot.

When the bottle landed on the awning, it exploded in a ball of fire and with a deafening sound. The explosion blew an 18-inch hole in the metal awning, sending shrapnel flying. Many pieces struck a 12-year-old- boy, Darrell L., causing numerous superficial cuts and a broken finger. Other persons were hit by flying metal, including Benny Eskridge, who pulled a piece of metal from his thigh. Various witnesses hinted there was an element of racial conflict in the original disturbance; [Petitioner] is African-American and residents of the apartment complex involved in this incident are White.

[Petitioner], who was wearing a white T-shirt and dark shorts when he threw the bomb, fled to the home of his friend Anne Jones. He appeared agitated and upset. He asked Jones to lend him some different clothes and to give him a ride. She gave him a red T-shirt and drove him to a public telephone. (Jones did not have a telephone at her apartment.) During the drive, [Petitioner] threw his white T-shirt from the car. [Petitioner] slumped down in the car seat so he could not be seen. When

---

[2] The Court finds the Court of Appeal correctly summarized the facts in its May 19, 19997 opinion. Thus, the Court adopts the factual recitations set forth by the California Court of Appeal, Fifth Appellate District.

2

1    Jones asked what was the matter, [Petitioner] told her not to worry about it.
2            Jones heard [Petitioner] say during a telephone call he "already did it" and to
     get his daughter "the hell out" of the house. [Petitioner] then called Joseph Robles,
3    who lived diagonally across the alley from where the bomb exploded. [Petitioner]
     repeatedly asked what happened and whether anyone was hurt.  Since Robles had
4    seen [Petitioner] in the alley during the initial disturbance but not after the bomb was
     thrown, he urged [Petitioner] to come back and speak to the police. [Petitioner] hung
5    up the telephone.  About an hour later, [Petitioner] appeared at Robles's door trying to
     borrow money.  When Robles again asked him to contact the police, [Petitioner]
6    cursed and left with Jones.
             As Jones drove [Petitioner] back to her apartment, [Petitioner] was still
7    agitated, muttering about "tak[ing] out your whole race" and hitting the windshield.
     He continued to deny to Jones that anything was wrong, although he said it was
8    Darrell's own fault he was injured since he should not have been playing in the alley.
     According to Anne Jones, [Petitioner's] mother came to Jones's apartment later that
9    evening; she argued loudly with [Petitioner], but Jones did not hear the substance of
     the argument.

10   (Opinion, at 2-3, footnote omitted.)

11                                        DISCUSSION

12   A.     Jurisdiction

13           Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

14   to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of

15   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

16   375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered violations of his rights as

17   guaranteed by the U.S. Constitution.  The challenged conviction arises out of the Kern County

18   Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 2241(d).

19           On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

20   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

21   Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct.

22   586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (quoting Drinkard v. Johnson, 97

23   F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other*

24   *grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable

25   to cases filed after statute's enactment).  The instant petition was filed after the enactment of the

26   AEDPA and is therefore governed by its provisions.

27   B.     Standard of Review

28           This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody

                                               3

1    pursuant to the judgment of a State court only on the ground that he is in custody in violation of the

2    Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

3         The AEDPA altered the standard of review that a federal habeas court must apply with

4    respect to a state prisoner's claim that was adjudicated on the merits in state court. Williams v.

5    Taylor, 120 S.Ct. 1495, 1518-23 (2000).  Under the AEDPA, an application for habeas corpus will

6    not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or

7    involved an unreasonable application of, clearly established Federal law, as determined by the

8    Supreme Court of the United States;" or "resulted in a decision that was based on an unreasonable

9    determination of the facts in light of the evidence presented in the State Court proceeding." 28

10   U.S.C. § 2254(d); Lockyer v. Andrade,123 S.Ct.1166 (2003) (disapproving of the Ninth Circuit's

11   approach in Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000)); Williams v. Taylor, 120 S.Ct.

12   1495, 1523 (2000).  "A federal habeas court may not issue the writ simply because that court

13   concludes in its independent judgment that the relevant state-court decision applied clearly

14   established federal law erroneously or incorrectly."  Lockyer, at 1175 (citations omitted).  "Rather,

15   that application must be objectively unreasonable."  Id. (citations omitted).

16        While habeas corpus relief is an important instrument to assure that individuals are

17   constitutionally protected, Barefoot v. Estelle, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391-3392 (1983);

18   Harris v. Nelson, 394 U.S. 286, 290, 89 S.Ct. 1082, 1086 (1969), direct review of a criminal

19   conviction is the primary method for a petitioner to challenge that conviction.  Brecht v.

20   Abrahamson, 507 U.S. 619, 633, 113 S.Ct. 1710, 1719 (1993).  In addition, the state court's factual

21   determinations must be presumed correct, and the federal court must accept all factual findings made

22   by the state court unless the petitioner can rebut "the presumption of correctness by clear and

23   convincing evidence."  28 U.S.C. § 2254(e)(1); Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769

24   (1995); Thompson v. Keohane, 516 U.S. 99, 116 S.Ct. 457 (1995); Langford v. Day, 110 F.3d 1380,

25   1388 (9th Cir. 1997).

26   C.     Use of Peremptory Challenges Based on Race

27         Petitioner contends that his right to equal protection was violated when the prosecution

28   exercised peremptory challenges on the basis of racial bias.  More specifically, Petitioner contends

4

1   that the trial court erred when it found that the distinction between great bodily injury and bodily

2   injury supported the prosecution's reason for excusing the potential jurors.

3         In his traverse, Petitioner argues that the trial court did not make an adequate determination

4   as to whether there was discriminatory intent under Batson.  Petitioner contends that had the trial

5   court made such a determination, it would have discovered that there was no issue concerning the

6   extent of the injuries suffered by the victims and therefore the prosecution's proffered reason for

7   excusing the jurors was improper.

8         Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal

9   and state trials is governed by the standard established by the United States Supreme Court in Batson

10  v. Kentucky, 476 U.S. 79, 89 (1986).  In Batson, the United States Supreme Court set out a three-

11  step process in the trial court to determine whether a peremptory challenge is race-based in violation

12  of the Equal Protection Clause.  Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769 (1995).  First,

13  the defendant must make a prima facie showing that the prosecutor has exercised a peremptory

14  challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and

15  circumstances of the case "raise an inference" that the prosecution has excluded venire members

16  from the petit jury on account of their race. Id.

17        If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-

18  neutral explanation for its challenge. See id.   At this step, "the issue is the facial validity of the

19  prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation,

20  the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111

21  S.Ct. 1859  (1991).  Finally, the trial court must determine if the defendant has proven purposeful

22  discrimination.

23        In rejecting Petitioner's claim on appeal, the Fifth District Court of Appeal first explained the

24  burden-shifting framework set forth in Wheeler and Batson.  The court held:

25              Substantial evidence supports the trial court's conclusion that the prosecutor
            did not impermissibly exclude minority jurors solely on the basis of their race. . . .
26              At the time the prosecutor first accepted the jury panel, she had excused only
            one minority juror, a certified nursing assistant.  She had also excused two White
27          jurors.  One of these was not only a "medical technologist" but also worked at a state
            prison, ordinarily a person who might be viewed as proprosecution.  (The other White
28          juror excused was a retired convalescent-home food service supervisor.)

After the prosecutor accepted the panel, defense counsel exercised another peremptory challenge. The prosecutor then exercised five more challenges before again accepting the panel. Of those five, two involved African-American medical workers and one involved a disabled White nurse.[3]

While [Petitioner] acknowledges the ostensible plausibility of the prosecutor's explanation that she excused the African-American jurors due to their medical training, he vigorously contends this reason has "no 'logical relevance to the case,' and did not appear to be genuine."

Sections 12309 and 12310 "devise two degrees of punishment for persons who explode or ignite any destructive device or explosive resulting in personal injury to another: the higher punishment under section 12310 is where the victim suffers 'great bodily injury'; the lesser punishment under section 12309 is where the victim suffers merely 'bodily injury.'" Since, in the circumstances of the present case, "jurors might reasonably disagree as to when the bodily injury becomes 'great,'" [Petitioner] would have been entitled to an instruction on section 12309 as a lesser included offense for count 1. It is certainly not irrational to be concerned that medical personnel, who may have been exposed to life-threatening and other severe injuries, would not consider Darrell's relatively superficial injuries "great."

As a tactical matter, after the close of the evidence, [Petitioner] expressly requested that the court not instruct on the lesser included offense for count 1. Nevertheless, until that point in the trial, the distinction between great bodily injury and ordinary bodily injury was one that would legitimately have been before the jury. Accordingly, we cannot say as a matter of law that the prosecutor's reliance on the jurors' medical training was pretextual; phrased differently, there was substantial evidence to support the court's implied finding that the prosecutor's stated reason was genuine.

(Opinion, at 6-8, citations omitted.)

The state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. The Court of Appeal, in reviewing the trial court's granting of the <u>Wheeler</u> motion, applied both <u>Batson</u> and <u>Wheeler</u> in determining that the trial court did not abuse its discretion, a determination that is supported by the record in this case. The trial court found that the defense, after renewing the motion, had established a prima facie case. To establish a prima facie case, the defense was required to demonstrate that the facts and circumstances of the case raised an inference that the prosecution had excluded venire members on the account of their race. Given that Petitioner was African-American and there was evidence which suggested that the crime was the direct result of racial friction in the alley between Petitioner and White apartment occupants, the trial court's finding of a prima facie case was supported. In

---

[3]  The prosecution excused the only Hispanic, a young student who, in the words of the prosecutor, had "no substantial life experiences, that was the reason why she was excused." [Petitioner] did not take issue with that reason in the court below and does not do so on appeal. The other challenge exercised during this series excused a legal secretary, apparently White, whose husband was on permanent disability.

1   accordance with <u>Batson</u>, the trial court then offered the prosecution an opportunity to provide a race-

2   neutral explanation for the use of peremptory challenges.  The prosecution stated that each of the

3   potential African-American jurors had significant medical training "that I'm somewhat

4   uncomfortable with."  The prosecutor stated that she did not want the jury confused between the

5   "medical version" of great bodily injury and the legal definition of that term.  The prosecution's

6   proffered reason was reasonable in light of the fact that Petitioner was potentially facing a more

7   severe punishment if great bodily injury was legally proven.[4]  The trial court's determination that, in

8   light of Petitioner's prima facie case of discrimination and the prosecution's reason, there was no

9   intentional racial discrimination, is supported by the record and Petitioner's claim must fail.

10  Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable

11  application of, clearly established Supreme Court precedent.

12  D.   Prosecutorial Misconduct - Griffin Error

13       Petitioner contends that the prosecutor engaged in prejudicial misconduct by commenting on

14  his choice to remain silent.

15       Where a prosecutor on his own initiative asks the jury to draw an adverse inference from a

16  defendant's silence, or to treat the defendant's silence as substantive evidence of guilt, the

17  defendant's privilege against compulsory self-incrimination is violated.  <u>See</u>, <u>Griffin v. California</u>

18  380 U.S. 609, 615 (1965).   While it is proper for the prosecution to address defense arguments, a

19  comment is impermissible if it is manifestly intended to call attention to the defendant's failure to

20  testify, or is of such a character that the jury would naturally and necessarily take it to be a comment

21  on the failure to testify.  <u>See</u>, <u>Lincoln v. Sunn</u>, 807 F.2d 805, 809 (9th Cir. 1987) (<i>citing</i> <u>United States</u>

22  <u>v. Bagley</u>, 772 F.2d 482, 494 (9th Cir. 1985), <i>cert denied</i>, 475 U.S. 1023 (1986)).

23       Such commentary by the prosecutor violates due process only if "(1) the commentary is

24  extensive; (2) an inference of guilt from silence is stressed to the jury as a basis for the conviction;

25  _____

26  [4]  As noted by the Court of Appeal, the fact that Petitioner later requested that the jury not be instructed on the lesser
    included offense, the distinction between "great" bodily injury and bodily injury, was up until that point a matter that would
    be before the jury.  Petitioner's contention to the contrary is without merit.  At the time that the <u>Wheeler/Batson</u> motion was

27  raised, there was no way for the court to determine, irrespective of defense counsel's content, whether great bodily injury
    would or would not be in issue as no evidence had yet been presented.  Thus, up until that point, it was a potential issue in

28  the case.

1   and (3) where there is evidence that could have supported acquittal." Jeffries v. Blodgett, 5 F.3d

2   1180, 1192 (9th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994).  Further, any improper comments

3   warrant habeas relief only if it results in actual prejudice.  See, id. at 1190 (*citing* Brecht v.

4   Abrahamson, 507 U.S. 619, 627 (1993)).

5         During closing argument, the prosecutor argued as follows:

6            Now, here you wouldn't expect them to come in and say, you're right, I did it.
          Because that doesn't make any sense.  He's not going to do that.  If he was going to
7         take responsibility for it, he would have done it that night.  So obviously we don't
          even expect him to get on the stand and say you're right, I did it.  You're certainly not
8         going to expect his mother to come in and say, I think he did it.  That's her son she's
          not going to say that.  That doesn't make any sense.  So what happened here?  Well
9         he's got two options: Basically, he can either explain his actions or he can deny them
          with an alibi because there's reasonable doubt –

10  (RT 337.)

11        Defense counsel objected and an unrecorded side bar was held.  The prosecution was

12  admonished to not comment on Petitioner's failure to take the stand.  The prosecutor resumed her

13  argument as follows:

14           - - again, what we have here, what do you have?  You got eye-witnesses who
15        see him throw a bomb.  You got his behavior after.  What's the option: Explain what
          happened or he can deny it.  And that's an alibi defense and that's what you heard.
16        Because here - -

17  (RT 337.)

18        Defense counsel again objected and the jury was excused and the motion was heard.   The

19  court reiterated the admonishment and stated:

20           [I]t wasn't completely clear from the way your statement was phrased,
          initially, [what] you were referring specifically to on the issue of whether or not he
21        was denying this offense.  Whether he was denying it from statements outside of court
          or not taking the opportunity to deny it or if he was denying it or not taking the
22        opportunity to deny it at trial. [¶] . . . To state that he can deny this offense or he can
          offer an alibi isn't much different than saying he can offer an alibi or he can get up on
23        the stand and deny it.  There's only one way for a defendant to deny at trial to deny
          any offense that I can think of, unless you can think of any others, other than to testify
24        and say I didn't do it.  And you cannot comment about that potential manner of
          defense in any fashion if the defendant [has not] taken the stand.

25  (RT 338-339.)

26

27        The prosecutor resumed her argument and clarified as follows:

28           There's not a reasonable doubt to what happened here?  What's the defense?

8

> Well, I didn't do it because that's basically, that's basically [sic] all we have here is an ID issue.  So what's the defense?  I didn't do it.  However, folks, his actions say otherwise because his actions are what damned him before and after. . . .

(RT 340-341.)

The following day, defense counsel renewed his <u>Griffin</u> motion and requested a mistrial.  In opposition, the prosecutor argued:

> I will tell this Court what I was doing was commenting quite properly on the defendant's defense.  He chose to present an alibi defense, and I'm entitled to comment upon that defense.  In this case, what I said was, you can present - - you have the opportunity or he rather, presented a defense and I can comment on that.  He could either present an explanation or the alibi.  Here he presented an alibi defense because he really couldn't explain those behaviors and your Honor, just because I used the word "explain" doesn't mean the defendant - - because the witnesses can explain as well just like when I say the word "alibi," it doesn't mean that the defendant has to get up on that stand and say alibi.  In fact, that's not what happened.  Just because he had witnesses present, an alibi doesn't mean that it wasn't an alibi.  And it doesn't suggest that he should have or did not in no way by saying the word "alibi" does that suggest the defendant's or the defendant's testifying or not testifying.

(RT 359-360.)

In denying the motion for mistrial, the court stated:

> The court has instructed counsel not to - - the prosecution not to make references to the defendant's failing to deny the offense unless it is absolutely clear that the statement referred to or the lack of statement referred to by the prosecution is an out of court statement as opposed to what the defendant did or didn't say in court.  I am not inclined to read the instruction as given.  I am inclined to read an instruction as follows: Any suggestions by counsel that the defendant could and/or should have testified is improper and should be disregarded.  I will lead with that instruction in my closing instructions.

(RT 361.)

In rejecting Petitioner's claim on appeal, the Fifth District Court of Appeal, summarized the alleged prejudicial statements by the prosecution as follows:

> With appellate hindsight, we offer our interpretation of what the prosecutor was trying to say.  Apart from technical defenses that render irrelevant the question whether the crime was committed (defenses such as double jeopardy or statute of limitations), there are basically two ways of defending against criminal charges.  The defendant can acknowledge that the acts in question may have occurred and then assert that they were justified or excused - - asserting, for example, lack of capacity, lack of mens rea, entrapment or self-defense.  In the alternative, the defendant can deny that he committed the acts in question, either claiming he did not commit the acts or no such acts were committed by anyone.  Thus, in summary, it seems the prosecutor was trying to tell the jury that any defendant has two options: his defense can attempt to explain to the jury why his seeming crime is not a crime - - invoking lack of capacity, lack of mens rea, self-defense, or the like - - or his defense can deny that he committed the acts in question - - invoking alibi, mistaken identity or the like.

9

Although a simplified view of the law, this position seems unobjectionable.

The prosecutor intended to tell the jury that defendant did not assert the first kind of defense.  She said, in effect, if defendant was going to admit but justify his actions he would have done so at Robles's urging on the night of the crime or when Jones asked him what was wrong.  Since he did not, no one would "expect him to get on the stand [now] and say, you're right, I did it," but here is why my actions were not criminal.

Then the prosecutor intended to tell the jury that, logically, what was left was a denial defense - - "And that's an alibi defense and that's what you heard."  When she tried to make this latter point, however, she said: "What's the option: Explain what happened or *he can deny it*."

After being admonished, the prosecutor was more careful to phrase her argument in terms of "the defense" and not "the defendant": "So what's the defense?  I didn't do it . . . and you got one person who says he didn't do it; he was with me."  Thus, it eventually becomes clear that the prosecutor meant to say that defendant - - the defense - - did deny that he committed the crime, by means of a permissible alibi defense - - a defense that, if believed, results in reasonable doubt, as the prosecutor tried to say in her initial foray into this issue.

Thus, by carefully parsing her words, we see the prosecutor did not say that defendant's *failure to testify at trial* indicated his guilt.  Rather, she asserted that, as a matter of logic and tactics, defendant was compelled to resort to an alibi defense because he did not admit and justify his actions *on the night of the crime*, so any present justification would be unconvincing.

If she had succeeded in saying to the jury what she intended to say, the prosecutor's argument probably would have constituted a permissible comment on the state of the evidence.

The prosecutor did not succeed, however: it seems to us the argument was so ambiguous the jury probably interpreted the argument as a comment on defendant's failure to testify at trial.  Accordingly, the prosecutor committed *Griffin* error, albeit inadvertently.

(Opinion, at 11-13, citations and footnote omitted.)

The Court of Appeal went on to find that although <u>Griffin</u> error occurred, the error was harmless beyond a reasonable doubt.  It concluded that the prosecutor did not suggest that the jury draw an inference of guilt from Petitioner's silence at trial; rather, the prosecutor explained that such silence was understandable because Petitioner had not attempted to explain his conduct on the night in question.  When the prosecutor stated that Petitioner's other choice was to deny the conduct, it was eventually stated that he had denied it through alibi witnesses.  Thus, the Court of Appeal found that such indirect, brief and mild references to Petitioner's silence were harmless error.

Respondent argues that the prosecutor's statements were not a direct comment on Petitioner's failure to testify.  Respondent contends that even if the prosecutor's statements were deemed a commentary on Petitioner's failure to testify, the prosecutor did not suggest that the import of that failure was that Petitioner's election was itself a substantive indicator of guilt.  Respondent submits

1  that the prosecution's suggestion was at most that the failure to testify, and thereby to personally

2  explain Petitioner's commission of the charged conduct, reflected a choice of available methods of

3  defense.

4        In his traverse, Petitioner argues that Respondent has failed to demonstrate that the error was

5  harmless beyond a reasonable doubt.  Petitioner contends that neither Respondent or the Court of

6  Appeal has proven beyond a reasonable doubt that the error did not have a "substantial and injurious

7  effect" on the outcome of his case.

8        Review of the record shows that the prosecutor's allegedly prejudicial comments were not

9  extensive.  As noted by the Court of Appeal, the prosecutor came close to crossing the constitutional

10 line in commenting that Petitioner failed to explain or deny his actions.  The Court of Appeal held,

11 however, that if the prosecutor's statements were error, it was of the less prejudicial, indirect kind.

12 The Court found that the prosecutor did not suggest that the jury should draw an inference of guilt

13 from Petitioner's silence at trial; rather the prosecutor indicated that such silence was understandable

14 because Petitioner had not attempted to explain his conduct on the night in question.  The prosecutor

15 eventually stated that Petitioner had denied such conduct through his alibi witness.  The state courts'

16 decision was not contrary to, and did not involve an objectively unreasonable application of, clearly

17 established Supreme Court authority.  Both statements made by the prosecution were made in the

18 context of Petitioner presenting his alibi defense.  Both statements made by the prosecution were not

19 significant and were cured by the trial court's instruction that Petitioner's silence could not be used

20 to infer guilt or prejudice him.  The statements were made in the context of Petitioner presenting his

21 alibi defense.  The remarks were a small part of a entire argument, and it was corrected by the

22 prosecution's clarification that Petitioner's defense was that he did not do it and it was a mistaken

23 identity defense.  (RT 340-341.)  The trial court properly instructed the jury both before and after

24 closing arguments.[5]  Further, there was other substantial evidence to support Petitioner's conviction.

25 There were three eyewitnesses who heard Petitioner say, "Take this you bitch."  (RT 59-62, 90-93,

26

27        [5] Before counsel began their arguments to the jury, the court had instructed the jury concerning the elements of the
offense, the presumption of innocence, and the right of a defendant not to testify (using CALJIC Nos. 2.60 and 2.61).  After
28 argument of counsel, the court began its concluding instructions as follows: "Any suggestion by counsel that the defendant
could and should have testified is improper and should be disregarded."  (RT 374.)

1  111-113.)  Further, these eyewitnesses observed Petitioner in the alley and saw him throw the bomb

2  that exploded.  (RT 59-62, 90-93, 111-113.)  In sum, the prosecutor's statements could not have "had

3  a substantial and injurious effect or influence in determining the jury's verdict."  Accordingly, the

4  court finds no effective Griffin error.

5  E.      Due Process Violation - Restraint with Shock-Belt

6          Petitioner contends that his due process rights were violated when the trial court ordered him

7  to be restrained by a shock-belt.  Petitioner contends that a day after the device was placed on him,

8  the sheriff activated the device for no reason.  While this occurred, the jury was deliberating in a

9  room directly on the other side of the wall, where Petitioner could be heard screaming and yelling in

10 pain.  Petitioner made an oral motion for mistrial, which was denied.

11         An analysis of a trial court's decision to shackle a defendant throughout his trial properly

12 begins with the Supreme Court's decision in Illinois v. Allen, 397 U.S. 337 (1970). In Allen, the

13 Court set forth appropriate guidelines for maintaining judicial control of the courtroom. Id. at 351

14 (Douglas, J., dissenting). In a situation where the trial court is faced with a contumacious defendant,

15 the Supreme Court held that the trial judge has at least three constitutionally permissible options. He

16 may "(1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out

17 of the courtroom until he promises to conduct himself properly." Id. at 343-44. Upon discussing the

18 possibility of binding and gagging a defendant, the Court admonished that this option should be

19 employed only "as a last resort." Id. at 344 ("But even to contemplate such a technique, much less

20 see it, arouses a feeling that no person should be tried while shackled and gagged except as a last

21 resort.").  The Court recognized that "the sight of shackles and gags might have a significant effect

22 on the jury's feelings about the defendant . . . ." Estelle v. Williams, 425 U.S. 501, 504-505 (1976),

23 *quoting*, Allen, 397 U.S. at 344.

24         In Holbrook v. Flynn, 475 U.S. 560 (1986), the Supreme Court addressed the approach a

25 reviewing court should take in examining a trial court's decision to employ shackling: "All a ... court

26 may do ... is look at the scene presented to jurors and determine whether what they saw was so

27 inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial; if the

28 challenged practice is not found inherently prejudicial and if the defendant fails to show actual

12

1  prejudice, the inquiry is over." Id. at 572.  While many circuit courts have held that trial judges are

2  required to pursue less restrictive alternatives before imposing physical restraints, the Supreme Court

3  has not expressly held so.  See Woodard v. Perrin, 692 F.2d 220, 221 (1st Cir.1982); Kennedy v.

4  Cardwell, 487 F.2d 101, 111 (6th Cir.1973), cert. denied, 416 U.S. 959 (1974); Wilson v. McCarthy,

5  770 F.2d 1482, 1486 (9th Cir.1985); Elledge v. Dugger, 823 F.2d 1439, 1452 (11th Cir.) (per

6  curiam), opinion withdrawn in part on other grounds, 833 F.2d 250 (11th Cir.1987) (per curiam),

7  cert. denied, 485 U.S. 1014 (1988).

8         Stun belts are a method of prisoner restraint, used as an alternative to shackles.

9         A stun belt is an electronic device that is secured around a prisoner's waist.
         Powered by nine-volt batteries, the belt is connected to prongs attached to the
10       wearer's left kidney region.  When activated remotely, "the belt delivers a 50,000-
         volt, three to four milliampere shock lasting eight seconds."  Upon activation of the
11       belt, an electrical current enters the body near the wearer's kidneys and travels along
         blood channels and nerve pathways.  The shock administered from the activated belt
12       "causes incapacitation in the first few seconds and severe pain during the entire
         period."  Gonzalez v. Pliler, 341 F.3d 897, 899 (9th Cir. 2003).

13        In his traverse, Petitioner contends that the shock belt was placed on him prior to any factual

14 findings by the trial court as to its necessity.  Petitioner further contends that the decision to restrain

15 Petitioner and the method of such restraint was at the discretion of the bailiff and Sheriff's

16 Department.  Petitioner contends that the trial court did not make a factual findings that the restraint

17 was necessary.

18        A review of the record indicates that a hearing was held to determine whether the stun belt

19 restraint was necessary.  The bailiff testified that the transportation officer who had been transporting

20 Petitioner for the past four years indicated that he had problems with him in the past and he had a

21 very short fuse.  (RT 176.)  Additionally, that morning the bailiff discovered that Petitioner was a

22 high-risk inmate and his classification band was changed to a red band, which is a security risk.

23 Petitioner was on disciplinary isolation for assaultive behavior and Petitioner was unresponsive when

24 asked questions by the bailiff.  (Id.)  The bailiff added that Petitioner was "looking at 25 to life and

25 [she felt] that he [was] a security risk.  He is 6'1 approximately 240 pounds, and [she] just felt like

26 th[e] electronic device is the best security that the Sheriff's Department can have on him if we're not

27 going to be allowed to put shackles or handcuffs on him."  (RT 184.)  Defense counsel, after being

28

13

1   sworn as a witness, testified that he had never had any encounter with Petitioner and based on his

2   experience as a defense attorney he did not feel Petitioner was a threat to any of the parties. (RT 185-

3   188.)  In response, the prosecutor indicated that Petitioner had given her a "mad dog" glare.  (RT

4   188.)  The court held that the belt was to remain because it was not a visible restraint.  Further,

5   Petitioner had previously engaged in assaultive behavior while in custody and in relation to the

6   bailiff as well as glared at the prosecutor.  (RT 189.)

7        Here, the trial court did all that was constitutionally required under the law in allowing the

8   stun belt to remain on Petitioner during trial.  The court properly held an evidentiary hearing where

9   the court heard the testimony from the bailiff, defense counsel, and the prosecutor.  After hearing and

10  considering the evidence presented, the court independently determined that Petitioner was a security

11  risk and the stun belt was a necessary restraint in light of his past and present conduct. This was not

12  an instance where the trial court merely relied on the bailiff's belief in the necessity for the

13  restraints.[6]  The trial court made an independent determination as to the necessity of the restraint and

14  sufficient evidence supports that finding.  There was evidence that Petitioner previously engaged in

15  assaultive behavior while in custody, had glared at the prosecutor during trial, and did not maintain a

16  good working relationship with the bailiff in the courtroom.  These circumstances viewed as a whole,

17  support the trial court's decision to place Petitioner in the stun belt.  Accordingly, Petitioner's claim

18  is without merit.

19       Even if it was error for the trial court to place Petitioner in physical restraints, Petitioner has

20  not demonstrated any prejudice.  Initially, the physical restraint was not visible to jury.  Further,

21  Petitioner never requested that a lesser restraint be placed upon him, nor is there any record of a

22  complaint that he was unable to participate in his trial.

23       Petitioner merely contends that the accidental activation of the stun belt resulted in prejudice.

24  However, Petitioner has not demonstrated that the jurors heard or even more were influenced by the

25  accidental activation.  There was a defense motion for a new trial, to which it was determined that

26

27  _____

28      [6]  Compare Gonzales v. Pliler, 341 F.3d 897 (9th Cir. 2003)(trial court did not hold an evidentiary hearing to
    determine necessity of the electronic stun belt.)

14

1  Petitioner had not demonstrated that any of the jurors heard the accidental activation.[7]  (RT 383-

2  386.)  In this forum as in the state court, Petitioner raises nothing more than his conclusory allegation

3  that the jury was somehow effected by the accidental activation.

4        To the extent Petitioner contends, as he did in the state court, that he was denied fundamental

5  fairness due to an alleged psychological affect of the belt during trial, it is without merit.  As

6  Respondent acknowledges, any criminal defendant may entertain subjective fear that he will suffer

7  some arbitrary consequence if those who maintain custody over him react to his actions in a manner

8  in which the defendant deems unfair.  Petitioner presents no evidence to prove an objective basis for

9  his subjective belief that the bailiff might engage in irrational conduct, or that at trial he had

10  objective reason to believe the bailiff was prone to prophylactic activation of the electronic belt.

11  Further, Petitioner presents no evidence that he was compelled to endure his subjective uncertainty

12  as to when the belt might be purposefully activated.[8]  Petitioner simply has not demonstrated that the

13  state courts' determination was contrary to or an unreasonable application of Supreme Court

14  authority.

15        Finally, as Respondent submits, Petitioner's Fourth Amendment claim, asserted to the

16  California Supreme Court based upon the accidental activation of the electronic belt, may not be

17  renewed in this forum.  See Stone v. Powell, 428 U.S. 465, 493-495 (1976); Gordon v. Duran, 895

18  F.2d 610, 613-614 (9th Cir. 1990).[9]

19

---

20  [7]  It is noteworthy that the record demonstrates that the jury deliberated extensively, requesting both readback of
several witnesses testimony and review of certain exhibits. (RT 383, 387, 390, 392, 397.)  Further, subsequent to the
21  accidental activation, the jury at one point indicated that it was deadlocked. (RT 395.)  This conduct greatly diminishes
Petitioner's claim that the jury was somehow influenced by the accidental activation.

22

23  [8]  Although there is no denying that in fact the belt ultimately did activate accidentally - during a period after the
evidentiary presentation and argument to the jury was complete - there is no suggestion that Petitioner did anticipate or had
reason to anticipate such an accident prior to that point.

24

25  [9]  Moreover, as Respondent submits, the California Supreme Court did not exceed the bounds of objective reason
by rejecting Petitioner's claim.  The trial judge made a factual finding that the activation of the belt was "accidental" (Kern
26  County Superior Court Order of June 21, 1999, at 3), and Petitioner did not identify to the California Supreme Court any
record evidence which tended to demonstrate otherwise. Because a mere accident is neither a search nor a seizure within the
meaning of the Fourth Amendment, County of Sacramento v. Lewis, 523 U.S. 833, 844 (1998); Brower v. County of Inyo,
27  489 U.S. 593, 596 (1989)("the Fourth Amendment addresses 'misuse of power,' [citation], not the accidental effects of
otherwise lawful government conduct"), the California Supreme Court's denial of relief on Fourth Amendment grounds
28  cannot be deemed objectively unreasonable in this case.

15

1   F.   Jury Misconduct

2        Petitioner contends that the trial court neglected its duty to investigate the allegation of jury

3   misconduct.

4        "In all criminal prosecutions," state and federal, "the accused shall enjoy the right to . . . trial

5   . . . by an impartial jury," U.S. Const., Amends. 6 and 14; see Duncan v. Louisiana, 391 U.S. 145

6   (1968).  In reviewing a claim of juror misconduct, "[t]he test is whether or not the misconduct has

7   prejudiced the defendant to the extent that he has not received a fair trial." United States v. Klee, 494

8   F.2d 394, 396 (9th Cir. 1974), *cert. denied*, 419 U.S. 835 (1974).  As recently set forth by the Ninth

9   Circuit Court of Appeals in Sims v. Rowland, 414 F.3d 1148, 1153 (9th Cir. 2005),

10       The Supreme Court has twice addressed the propriety of holding a hearing to
         investigate evidence of juror bias.  See Remmer v. United States, 347 U.S. 227
11       (1954); Smith v. Phillips, 455 U.S. 209 (1982).  Neither case mandates a hearing
         whenever evidence of juror bias is raised; nor does either case address the situation
12       presented here, where no party has requested a hearing to investigate evidence of juror
         bias.

13

14       On August 2, 1996, at the end of a session which commenced at 9:45 a.m., the jurors retired

15   for deliberations.  (RT 379.)  A recess followed.  (RT 382.)

16       Just before 10:50 a.m., the court and the parties assembled and the court observed there was a

17   "matter" regarding the electronic belt, which would be addressed after the court addressed the jurors'

18   question regarding "lineup photographs."  (RT 382.)  At 10:50 a.m., the jurors returned, they were

19   addressed regarding the photographs, and they again retired for deliberations.  (RT 383.)

20       Then, defense counsel placed a court deputy on the witness stand in an effort to establish

21   grounds for a "mistrial with prejudice."  (RT 383.)  The deputy testified that the belt accidentally

22   activated a few minutes before.  Petitioner was wearing the belt at the time, and he was in a holding

23   cell.  (RT 384-385.)

24       When the belt activated, Petitioner "hollered" at the "top of his lungs," although the deputy

25   did not recall what words were said.  (Id.)  Without objection, the record reflected that the words

26   heard by the judge inside the courtroom were, "Oh shit."  (RT 385.)  The courtroom was directly

27   adjacent to the holding cell.  (Id.)

28       The jury deliberation room was "very close" to the holding cell.  It was not established that

16

1    this room was adjacent to the holding cell.  (RT 384.)

2           Defense counsel asserted the jurors heard Petitioner "screaming at the top of his lungs and

3    cursing just on the other side of the wall from where they are all deliberating," and he sought a

4    mistrial with prejudice.  (RT 386.)

5           The trial judge stated, "Well, the motion is denied.  There is no showing at this point that the

6    jury heard it or attributed to your client."  (Id.)

7           Petitioner raised the instant claim in the state habeas corpus petition filed in the Kern

8    County Superior Court, which held,

9           Petitioner has failed to present any facts and/or documentary evidence of jury
       misconduct as a result of Petitioner's scream from the accidental activation of the
10      electronic belt.  Petitioner has failed to show that the jury heard the scream, failed to
       show that the jury knew that it was Petitioner who screamed, and that hearing the
11      scream impacted in any manner on the jury's deliberation.  Nor has Petitioner shown
       that there were any allegations of juror misconduct.  The trial transcript indicates that
12      Petitioner's attorney moved for a mistrial on the basis that Petitioner's scream may
       have affected the jury's deliberations.  ([RT] 214/22-217/17.)  This is not an
13      allegation of jury misconduct.  As Petitioner has failed to show any juror misconduct,
       Petitioner cannot show that the Court neglected any duty to investigate.  Therefore,
14      Petitioner's claim that the Court failed to investigate allegations of jury misconduct is
       an unsupported conclusory allegation that is insufficient to support the relief
15      requested.

16   (Opinion, at 3.)[10]

17          Here, as the Superior Court observed, defense counsel made only a claim for mistrial.  There

18   was no claim of jury misconduct, and there was no sua sponte duty on the part of trial judge to raise

19   such an issue.  Sims v. Rowland, 414 F.3d 1148 (9th Cir. 2005)("the Supreme Court has not yet

20   decided whether due process requires a trial court to hold a hearing *sua sponte* whenever evidence of

21   juror bias comes to light.") (emphasis in original.)  As Respondent points out and the Ninth Circuit

22   stated in Sims, Remmer v. United States, 347 U.S. 227 (1954), did not establish that the trial court

23   has a sua sponte duty to investigate a charge of jury misconduct.  Sims, 414 F.3d at 1154.

24   _____

25          [10] Because the California Supreme Court's opinion is summary in nature, this Court "looks through" that decision
     and presumes it adopted the reasoning of the California Superior Court, the last state court to have issued a reasoned opinion.
26   See Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (establishing, on habeas
     review, "look through" presumption that higher court agrees with lower court's reasoning where former affirms latter without
27   discussion); see also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to last reasoned
     state court opinion in determining whether state court's rejection of petitioner's claims was contrary to or an unreasonable
28   application of federal law under § 2254(d)(1)).

1    Additionally, as stated in <u>Sims</u>, <u>Smith v. Phillips</u>, 455 U.S. 209 (1982), did not answer or even

2    comment on the constitutional question of whether a hearing is required whenever evidence of juror

3    bias is brought to light despite the absence of a request from defense counsel.  <u>Sims</u>, 414 F.3d at

4    1154.

5           As Respondent submits in its supplemental answer, trial counsel elected to seek a mistrial

6    based on the factual assertion that the jurors heard Petitioner yelling, and he failed to demonstrate

7    that factual basis despite the fact the trial court imposed no limits on the evidentiary presentation.

8    (See RT 385-86.)  As the trial court found, the factual showing, then as now, did not demonstrate the

9    jurors heard Petitioner, that had they heard there would have been any reason to conclude the voice

10   was that of Petitioner (Petitioner did not testify at trial), or that there was any reason to find such

11   yelling incriminating.  Thus, it was reasonable for the state court to reject that there was resulting

12   prejudice to Petitioner.[11]    Accordingly, Petitioner's claim fails on the merits.

13   G.    Judicial Bias

14          Petitioner contends that the trial judge was biased against him.   Petitioner contends that

15   while a post-conviction motion was pending, the trial court was placed on notice that an investigator

16   for the prosecution had contacted at least one juror and relayed prejudicial information about

17   Petitioner and his defense.

18          The Due Process Clause guarantees a criminal defendant the right to a "fair trial in a fair

19   tribunal," which includes a trial judge with no actual bias.  <u>Bracy v. Gramley</u>, 117 S.Ct. 1793, 1797

20   (1997).  "Every procedure which would offer a possible temptation to the average man as a judge . . .

21   not to hold the balance nice, clear, and true between the state and the accused denied the latter due

22   process of law."  <u>Tumey v. Ohio</u>, 273 U.S. 510, 532, 47 S.Ct. 437, 444 (1927).  Thus, the Supreme

23   Court has held that the due process clause might at times bar a judge who has no actual bias to

24   _____

25          [11]   Petitioner's contention in his supplemental response that defense counsel did request an evidentiary hearing,
     which was denied, is unfounded.  Petitioner cites to Reporter's Transcript at 203-204, 206-212, 266.  This portion of the
26   transcript involves questioning of witnesses during the evidentiary phase of the trial, which simply cannot support Petitioner's
     assertion that his counsel requested an evidentiary hearing regarding any potential juror bias, as the basis for his claim had
27   not yet occurred.  The accidental activation of the stun belt did not occur until after the completion of the evidentiary phase -
     while the jury was deliberating.  Thus, Petitioner's citation to the record during the evidentiary phase of the trial is wholly
28   unfounded and does not support his assertion.

1   satisfy the appearance of justice.  In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625 (1955).

2       While the common law, statute, and professional standards give guidance for when a judge

3   should recuse herself, only violations of the Constitution will result in the reversal of a conviction on

4   writ of habeas corpus.  Bracy, 117 S.Ct. at 1797.  There are cases where a judge's implied bias

5   creates such a high probability of actual bias as to violate the Constitution.  Withrow v. Larkin, 421

6   U.S. 35, 46, 95 S.Ct. 1456, 1464 (1975).  For example, the Supreme court has found that Due

7   Process requires disqualification of a judge when the judge has direct financial interest in the

8   outcome of a case, see, e.g., Aetna, 475 U.S. 813, 822-24, 106 S.Ct. 1580, 1586-87 (1986), is faced

9   with substantial direct personal insults from a litigant, see, e.g., Taylor, III v. Hayes, 418 U.S. 488,

10  501-03, 94 S.Ct. 2697, 2704-06 (1974); Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S.Ct. 499

11  (1971); or if he had significant prosecutorial and adjudicatory functions in the same case, see, e.g.,

12  Murchison, 349 U.S. at 134-36, 106 s.Ct. at 1585.  These cases indicate a judge's implied basis

13  violates the Constitution if the judge had "direct, personal [and] substantial" influences on the judge

14  or some other incentive for bias.  See Aetna, 475 U.S. at 822, 106 S.Ct. at 1585.

15      Habeas relief is limited to those cases where there is proof of actual bias, or a possible

16  temptation so severe that one might presume an actual, substantial incentive to be biased.  Del

17  Vecchio v. Illinois Dep't of Corrections, 31 F.3d 1363, 1380 (7th Cir. 1994).

18       While the judge may have made rulings unfavorable to petitioner, judicial rulings alone are

19  not a basis for concluding that the judge was not impartial.  See Liteky v. United States, 510 U.S.

20  540, 551 (1994) (stating that judicial rulings alone almost never constitute valid basis for finding

21  bias).

22      As previously discussed, habeas relief is limited to those cases where there is proof of actual

23  bias, or a possible temptation so severe that one might presume an actual, substantial incentive to be

24  biased.  Del Vecchio, 31 F.3d at 1380.  In this case, Petitioner has not provided this Court with any

25  such evidence.  Petitioner does not state why he believed the trial judge could not grant him a fair

26  and impartial trial.  Petitioner simply argues that while a post-conviction motion was pending, the

27  trial judge became aware that an investigator for the prosecution contacted at least one juror and

28  relayed prejudicial information about plaintiff and his defense.

1    The Court finds that Petitioner has not carried his burden of showing a deprivation of due

2    process.  Petitioner has not demonstrated that trial judge harbored any bias, actual or perceived, so as

3    to violate Petitioner's due process rights.  As stated above, Petitioner's mere disagreement with a

4    trial judge's ruling is insufficient to demonstrate judicial bias.  Further, there is no indication that the

5    trial judge had any financial interest in the outcome of petitioner's case, had been subjected to

6    substantial personal insults from petitioner, or had a prosecutorial function.  Habeas relief is limited

7    to those cases where there is proof of actual bias, or a possible temptation so severe that one might

8    presume an actual, substantial incentive to be biased.  See Del Vecchio v. Illinois Dept's of

9    Corrections, 31 F.3d 1363, 1380 (7th Cir. 1994).  There is simply no such evidence in this case.

10   Petitioner's contention is nothing more than a vague and conclusory allegation.  "[C]onclusory

11   allegations which are not supported by a statement of specific facts do not warrant habeas relief."

12   James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994), cert. denied, 513 U.S. 935, 115 S.Ct. 333 (1994).

13   H.    Exclusion of Evidence of Mistaken Identity

14        Petitioner contends that the trial court erred in excluding evidence which supported his

15   defense of mistaken identity.  Petitioner contends that the pre-trial and in-court identifications of him

16   were so impermissible that the jury should have never been allowed to consider them.

17        A review of the record indicates that three separate witnesses identified Petitioner as the

18   individual who threw the bomb that exploded.

19        First, Jeannie Norris identified Petitioner from a pretrial photographic array and in person

20   during trial.  (RT 90, 92, 96-97, 109.)  In his traverse, Petitioner contends that Ms.  Norris's

21   testimony was not credible because she consumed alcohol on the night in question and because she

22   contradicted herself.  Specifically, Petitioner argues that Ms. Norris told Agent Lee that she had been

23   drinking that night and did not pay close attention to the person who threw the beer bottle.  However,

24   during trial, she testified that she never told Agent Lee that she did not pay attention to the person.

25        Ms. Norris was subject to cross-examination by Petitioner's counsel.  During cross-

26   examination, the following colloquy took place:

27        Q.    And do you recall being interviewed by Agent Dana Lee?
          A.    Yes, I do.
28        Q.    Did you tell Agent Lee that you hadn't paid much attention to the bomber?

1   A.   That I hadn't paid much attention to it?
    Q.   Right.
2   A.   No.  I paid attention to it.
    Q.   So you never told them that?
3   A.   I don't understand what you're trying to - -
    Q.   Well, maybe my question is complicated.
4        Did you tell Agent Dana Lee that you didn't pay much attention to the person who did the bombing?
5   A.   No.
    Q.   No, you didn't tell them that?
6   A.   I'd have to look at my paper what exactly I said that night.  It's been so many - -
    Q.   Did somebody give you paperwork?
7   A.   No.
    Q.   Well, my statement that I gave the police or Dana - - give you - - do you have a copy of that?
8   A.   No.  You do, I'm sure.
9   Q.   Okay.  So it might be true, you just don't remember if you said it or not?
    A.   I paid attention to the bomber.  I paid attention.  He came around the corner.  Yes, I did.
10  Q.   I'm asking you if you told them that or not?
11  A.   I don't recall.

12  (RT 105: 10-28; 106:1-9.)

13       Later, during the trial, defense counsel, called Agent Lee as a witness.  The following

14  examination took place:

15  Q.   Let me go on to Ms. Norris.  When you interviewed her regarding this incident, did she tell you that she had been drinking anything of an alcoholic nature on the night of
16       the bombing?
    A.   Yes, sir, she did make the comment that on that day she had been drinking.
17  Q.   And did you inquire of her how many drinks she might have had that evening?
    A.   I don't know if I asked her how many.  I think I did ask her like, I mean were you
18       drinking?  Were you like really, really drunk or what?  Well, she said I've been drinking.
19  Q.   Did she say anymore?
    A.   Not about the drinking.
20  Q.   All right.  And did she tell you that she didn't really pay attention to the person who threw the bomb?
21  A.   Yes, sir.  I think she made some comment - - because I - - do you want me to continue?
22  Q.   I'm sorry, I didn't mean to interrupt you.
    A.   Because I was asking her how can you be sure that that's who it was.  And she said,
23       well, I saw him.  I heard his voice.  And apparently, Ms. Norris and the defendant had had a confrontation several weeks earlier, which brought them together, and he had
24       spit in her face.

25  (RT 274:8-28; 275:1-4.)

26       No further questions were asked.

27       Thus, the fact that Ms. Norris was drinking on the night in question and the fact that she

28  might have communicated that she did not pay much attention to the bomber on the night in

21

1   question, was brought out in cross-examination and during direct examination of Agent Lee.  Thus,

2   any impeachment value was a determination for the jury to make.  The fact that Ms. Norris made

3   prior inconsistent statements with her current testimony was a proper matter for the jury to

4   determine.  Credibility of witnesses is a question for the jury to decide.  Whether Ms. Norris may

5   have contradicted herself was therefore a question for the jury, not the judge.

6         With respect to Teresa Gire, Petitioner argues that she testified that she knew it was

7   Petitioner who threw the bottle because that is what everybody said.  However, Petitioner argues that

8   Ms. Gire has never seen him before and was unable to identify him in a photographic line-up.

9   Petitioner therefore contends that Ms. Gire contradicted herself when she said that she saw Petitioner

10   throw the bottle.

11         On direct examination of Teresa Gire, the following colloquy took place:

12       Q.   Okay.  Did you see who did it?
         A.   I seen the guy, yes.

13       Q.   Okay.  Could you describe the guy?
         A.   He was a black male.

14       Q.   Could you see what that person was wearing?
         A.   He had a white shirt on, and I know - - I wasn't sure if it was shorts or pants.  It's

15             been a while but they were dark.  It was a dark color.
      Q.   Could you tell anything else about the person who threw it?

16       A.   Yeah.
      Q.   What's that?

17       A.   He was black and he had a round head and he was stocky.
      Q.   You remember noting that at the time?

18       A.   (Witness nods head.)
      Q.   Ma'am, is the person who threw the bomb present in court?

19       A.   Yes.
      Q.   Could you please tell the jury where is he seated and describe what he's wearing.

20       A.   Seated right there.  He's wearing a white shirt.

21   (RT 112: 19-28; 113: 1-13.)

22         There was further testimony as to Petitioner identity as follows:

23       Q.   Okay.  Now, after that night, I assume you spoke with police about what had
            happened?

24       A.   Yes.
      Q.   And you described, you described the person who threw the bomb, did you not?

25       A.   Yes.
      Q.   At that time, did you know who did it?

26       A.   Just from what everybody said, his name.
      Q.   But you had not ever seen that person before?

27       A.   Never.
      Q.   At some point were you shown a photo lineup?

28       A.   Yes.

| | |
|---|---|
| Q. | Were you able to identify anyone in the photos? |
| A. | No. |
| Q. | But a moment ago you testified that the person seated over there was the person who threw the bomb; is that correct? |
| A. | Yes. |
| Q. | How were you able to identify him now? |
| A. | Because I seen him throw it. |
| Q. | Okay.  Are you positive that it's him? |
| A. | Yes. |

(RT 114: 24-28; 115: 1-18.)

Ms. Gire was not cross-examined as to her testimony regarding Petitioner's identity.  To the extent that Ms. Gire's testimony was contradictory and/or inconsistent, that is a determination of credibility for the jury to determine as to how much weight to give to her testimony.  Petitioner's contention that Ms. Gire knew of Petitioner's identity based on what everyone had said is a misstatement of her testimony.  Ms. Gire's testimony was that she learned of his name through what everyone else had said.  Ms. Gire specifically testified that she knew that it was Petitioner who threw the bottle that exploded because she saw him throw it.  (RT 115.)  Accordingly, Petitioner's claim is without merit.

With regard to Darrell Langton, Petitioner argues that Mr. Langton informed officers that he had seen the person responsible for his injuries but he did not know the person.  However, then Mr. Langton later told agents that he knew "Dell" was responsible for his injuries.  Petitioner argues that Mr. Langton was unable to identify Petitioner in a photo line up.  However, when Agent Lee told Mr. Langton that he had indicated that "Dell" had done it, Mr. Langton then picked Petitioner's photograph out of the line up.

During direct examination, Mr. Langton testified that he heard someone say "Take this you, bitch."  (RT 59.)  Mr. Langton further testified as follows:

| | |
|---|---|
| Q. | So you heard somebody say that, right? |
| A. | Yes. |
| Q. | Did you look to see who said that? |
| A. | Yes. |
| Q. | Did you see who that person was? |
| A. | Yes. |
| Q. | Who said that? |
| A. | (Witness is pointing.) |
| Q. | Okay.  Is the person you saw in court here today? |
| A. | Yes. |
| Q. | Could you please tell the jury and the judge where that person is at? |

| | | |
|---|---|---|
| 1 | A. | He's right there. |
| | Q. | What's that person wearing? |
| 2 | A. | White. |
| | | THE COURT: The witness has identified the defendant, Mr. Harrison. |
| 3 | Q. | Did you know him back then? |
| | A. | Yes. |
| 4 | Q. | What's his name? |
| | A. | Wendell Harrison. |
| 5 | Q. | How did you know him? |
| | A. | Mike was one of his good friends. |
| 6 | Q. | And Mike Boyts was your mom's boyfriend? |
| | A. | Yes. |
| 7 | Q. | So you looked and you heard him say that statement and you looked and saw him, right? |
| 8 | A. | Yes. |

9  (RT 60: 3-28; 61: 1-4.)

10  During cross-examination, defense counsel questioned Mr. Langton as follows:

| | | |
|---|---|---|
| 11 | Q. | Darrell, you don't recall talking to Officer Weighorst at the hospital? |
| | A. | No. |
| 12 | Q. | And you don't recall her asking if you knew who threw the bomb? |
| | A. | That's the part I didn't remember. |
| 13 | Q. | Do you recall her asking you if you knew who threw the bomb?  Do you recall what you said? |
| 14 | A. | I just remember I got up there, and about five minutes later, an officer was talking to me about, Do you know who threw the bomb? What's your age?  What school did |
| 15 | | you go to?  I told her all the answers. |
| | Q. | Do you remember telling her that a black person threw it but you didn't know who it |
| 16 | | was? |
| | A. | (Witness nods head.) ... |
| 17 | Q. | You don't remember that? |
| | A. | I remember someone. |
| 18 | Q. | Do you remember taking a look at six photos? |
| | A. | Yes. |
| 19 | Q. | And they were all photos of black men? |
| | A. | Yes. |
| 20 | Q. | Do you remember an officer asking you if the person who threw the bomb was in those photos? |
| 21 | A. | Yes. |
| | Q. | What did you tell that person? |
| 22 | A. | I said I couldn't recall right now, then he put it away and then I asked for it again. |
| | Q. | After he put it away, did he tell you or did he remind you that you said Dell had done |
| 23 | | it? |
| | A. | Yes. |
| 24 | Q. | And did he tell you that Dell's photo was among that six? |
| | A. | Yes. |
| 25 | Q. | And then did he get out the photo lineup again for you? |
| | A. | I asked for it. |
| 26 | Q. | He got it out for you? |
| | A. | Yes. |
| 27 | Q. | And then you put your initials and said that Dell was in the photograph? |
| | A. | Yes. |
| 28 | | |

24

1   (RT 72:22-28; 73: 1-28; 74: 1-11.)

2       Under California law, a prior inconsistent statement may be admitted to impeach a witness.[12]

3   In the instant case, the above witnesses' prior inconsistent statements regarding Petitioner's identity

4   were brought to light through direct and/or cross-examination.  Thus, defense counsel impeached the

5   witnesses with their prior inconsistent statements.  At that point, it was a jury determination as to

6   how much weight they were going to give to the witnesses in court testimony that may have been

7   inconsistent with prior out-of-court statements.  Petitioner's claim that the trial court should have

8   excluded the witnesses testimony because it was contradictory is simply without merit, as credibility

9   issues are a jury determination.  Accordingly, Petitioner fails to state a claim for relief.

10      Moreover, an error of the trial court in admitting evidence under California law does not

11  violate the United States Constitution and is not the basis for habeas corpus relief.  Hendricks v.

12  Vasquez, 974 F.2d 1099, 1105 (9th Cir. 1992).  "[F]ailure to comply with the state's rules of evidence

13  is neither a necessary nor a sufficient basis for granting habeas relief." Jammal v. Van de Kamp, 926

14  F.2d 918, 919 (9th Cir. 1991).  Federal courts will not interfere with state evidentiary rulings unless a

15  violation of federal due process or right to fair trial results.  Jeffries v. Blodgett, 5 F.3d 1180, 1192

16  (9th Cir. 1993), cert. denied, 510 U.S. 1191, 114 S.Ct. 1294 (1994); Butcher v. Marquez, 758 F.2d

17  373, 378 (9th Cir. 1985) (ruling that even if admission of the defendant's alleged uncharged attempt

18  to kill his wife was erroneous under state rules of evidence, it was not so prejudicial as to be

19  unconstitutional).

20       In the case at hand, Petitioner's claims concerning the trial court's allowance of the above

21  witnesses to testify does not entitle petitioner to habeas corpus relief.  Petitioner has failed to

22  demonstrate that the admission of their testimony resulted in a violation of federal due process or

23

24      [12] "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is
    inconsistent with his testimony at the hearing and is offered in compliance with Section 770."  Cal Evid. Code § 1235.
25  California Evidence Code section 770 states:
            Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that
26          is inconsistent with any part of his testimony at the hearing shall be excluded unless:
            (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the
27          statement; or
            (b) The witness has not been excused from giving further testimony in the action.

28

1  right to fair trial.  In fact, the witnesses were subject to impeachment with their prior inconsistent

2  statements.  The trial court properly allowed the witnesses to testify and be impeached with their

3  prior inconsistent statements.

4         To the extent Petitioner argues that other evidence in support of his mistaken identity defense

5  should have been admitted, Petitioner fails to articulate what that evidence was and why it was

6  improperly excluded.  Thus, without such information the court cannot determine what that evidence

7  may have been.  Petitioner's conclusory allegation must therefore fail.  "[C]onclusory allegations

8  which are not supported by a statement of specific facts do not warrant habeas relief." James v. Borg,

9  24 F.3d 20, 26 (9th Cir. 1994), *cert. denied*, 513 U.S. 935, 115 S.Ct. 333 (1994).

10                                      RECOMMENDATION

11         Based on the foregoing, it is HEREBY RECOMMENDED that:

12         1.     The petition for writ of habeas corpus be DENIED; and

13         2.     Judgment be entered in favor of Respondent.

14         These Findings and Recommendations are submitted to the assigned United States District

15  Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the

16  Local Rules of Practice for the United States District Court, Eastern District of California.  Within

17  thirty (30) days after being served with a copy, any party may file written objections with the court

18  and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate

19  Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within

20  ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will

21  then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are

22  advised that failure to file objections within the specified time may waive the right to appeal the

23  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

24

25   IT IS SO ORDERED.

26  **Dated:    September 20, 2005                          /s/ Sandra M. Snyder**
    icido3                                    UNITED STATES MAGISTRATE JUDGE

27

28